# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| MARK J. KELLEY, | CV 12-74-BLG-SEH-CSO |
| Plaintiff, | ORDER and FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE |
| vs. | |
| BILLINGS CLINIC, | |
| Defendant. | |

After Plaintiff Mark J. Kelley ("Kelley") was fired from his employment with Defendant Billings Clinic ("Billings Clinic"), he filed this action asserting the following claims: (1) hostile work environment sexual harassment under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq.; (2) hostile work environment sexual harassment under the Montana Human Rights Act ("MHRA"), Mont. Code Ann. § 49-2-101, et seq.; (3) quid pro quo sexual harassment under Title VII; (4) quid pro quo sexual harassment under the MHRA; (5) retaliation under Title VII; (6) retaliation under the MHRA; and (7) tortious interference with his employment with another employer

under Montana law. *Second Am. Cmplt. (ECF 31) at 5-8.*[1]

Two separate but interrelated motions are pending: (1) Billings Clinic's motion for summary judgment on all claims, *ECF 63*; and (2) Kelley's motion for leave to supplement his response to Billings Clinic's summary judgment motion, *ECF 71*. By Order filed May 7, 2013, this matter was reassigned to Judge Haddon. It has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). *ECF 47 at 3.*

Having reviewed the record, together with the parties' arguments and submissions, the Court grants Kelley's motion and makes the following Findings and Recommendations with respect to Billings Clinic's motion for summary judgment.

## I. Kelley's Motion for Leave to Supplement Response to Motion for Summary Judgment

### A. Background

On July 31, 2013, Billings Clinic filed its summary judgment motion, supporting brief, statement of undisputed facts ("SUF"), and supporting exhibits. *ECFs 63, 64, and 65.* Under Local Rule 7.1

---

[1]"ECF" refers to the document as numbered in the Court's Electronic Case Files. *See The Bluebook, A Uniform System of Citation, § 10.8.3.*

(d)(1)(B), Kelley had 21 days to file his response brief. Under Local Rule 56.1(b) and (d), Kelley also was required to file a statement of disputed facts ("SDF").

On August 19, 2013, Kelley timely filed an unopposed motion for additional time to respond to Billings Clinic's summary judgment motion. *ECF 66.* On August 20, 2013, the Court extended the deadline for filing his response to September 6, 2013. *ECF 67.*

On September 6, 2013, Kelley filed his response brief and exhibits in opposition to Billings Clinic's summary judgment motion. *ECF 68.* Kelley did not file a SDF.

On September 20, 2013, Billings Clinic filed its reply brief. *ECF 70.* In it, Billings Clinic argued, in part, that its SUF must be deemed undisputed because Kelley failed to file a SDF. *Id. at 2-3.*

On September 24, 2013, Kelley filed his motion and supporting brief seeking leave to supplement his response to Billings Clinic's summary judgment motion by filing a SDF. *ECFs 71 and 72.* On October 8, 2013, Billings Clinic filed its opposition to Kelley's motion. *ECF 73.* On October 22, 2013, Kelley replied. *ECF 74.*

## B.    Parties' Arguments

Kelley seeks permission to supplement his response to Billings Clinic's summary judgment motion by filing his SDF.[2] *Mtn. to Supplement (ECF 71).*  He argues that, due to a "technical error in preparing the response for e-filing[,]" he failed to file his SDF at the time he electronically filed his brief and other materials in response to Billings Clinic's summary judgment motion. *Kelley's Br. (ECF 72) at 2.* His mistake, Kelley argues, was inadvertent and is "unrelated to the merits of the litigation." *Id.*  Kelley claims that he "immediately provided a copy of the [SDF] to Defendant when it was discovered that such document had not otherwise been provided." *Id.*  And Kelley argues that Billings Clinic will not suffer unfair prejudice if he is allowed to file his SDF because he will not object if Billings Clinic seeks to file a supplement of its own. *Id. at 3.*  As an attachment to his motion and brief, Kelley has filed the SDF he did not include in his original opposition to Billings Clinic's summary judgment motion and

---

[2]Although Kelley refers to the document as his "Statement of Disputed Issues," the Court refers to the document herein as a Statement of Disputed Facts ("SDF") consistent with the Local Rules. *See* L.R. 56.1(b).

which he now wishes to make part of the record. *ECF 71-1.*

Billings Clinic opposes Kelley's motion. *Billings Clinic's Resp. Br. (ECF 73).* It argues that: (1) because Kelley received an extension of time, he had 37 days to prepare and file his response to Billings Clinic's summary judgment motion rather than the 21 days provided by Local Rule ("L.R.") 7.1(d)(1)(B), *id. at 2*; (2) L.R. 56.1(b) requires that a party responding to a summary judgment motion file a separate SDF and Kelley did not file one, *id.*; (3) after receiving Kelley's response brief and other documents, Billings Clinic filed its reply brief supporting its summary judgment motion, *id.*; (4) Billings Clinic argued in its reply brief, in part, that its SUF is, in fact, undisputed because Kelley did not file a SDF and did not cite or refer to his SDF in his response brief, *id. at 2-3*; (5) Kelley's counsel's claim that he did not realize his SDF was not filed until he received Billings Clinic's reply brief is not credible because: (a) the Court's ECF system gives counsel redundant notices of what has been filed; (b) even after the filing was complete, Kelley's counsel had two weeks to review the filing to discover the absence of his SDF; © although Kelley's counsel claims the SDF was already prepared

at the time he filed his response and there is no way he could have prepared it in the time between receiving Billings Clinic's reply brief and his email seeking an extension of time, about 35 minutes actually elapsed from the filing of the reply brief and the email, which was enough time to draft the 4-page SDF; and (d) there are no references in Kelley's response brief to the SDF, *id. at 4-5*; and (6) Kelley's counsel has provided no basis to allow a supplemental filing here because he cannot show excusable neglect, Billings Clinic will suffer prejudice because it has been deprived of Kelley's SDF while preparing its reply brief, and Kelley's counsel has not acted in good faith because Kelley's response brief contains no mention of his SDF, *id. at 6-8*.

In reply, Kelley argues that his counsel's failure to notice the absence of his SDF until Billings Clinic raised the issue in its summary judgment reply brief is the type of excusable neglect contemplated by Rule 6(b).[3] *Reply Br. (ECF 74) at 1-2.* He adds that Billings Clinic's claim that he acted in bad faith is unfounded. *Id. at 2-4.* Finally, Kelley argues that the Court should permit him to file his SDF so that

---

[3]References to rules are to the Federal Rules of Civil Procedure unless otherwise indicated.

this matter can be resolved on its merits rather than on an unintentional, technical violation of the rules that has no bearing on the substance of the case. *Id. at 4-5.*

## C. <u>Legal Standard</u>

Rule 6(b)(1) governs motions for enlargement of time. Subject to certain exceptions not applicable here, the Court may, for "good cause," extend deadlines imposed by one of the Federal Rules of Civil Procedure. Whether to grant an enlargement of time is committed to the Court's discretion. *See In re Veritas Software Corp. Sec. Litig.*, 496 F.3d 962, 974 (9th Cir. 2007). Such a motion filed before a deadline has passed should "normally ... be granted in the absence of bad faith on the part of the party seeking relief or prejudice to the adverse party." *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1259 (9th Cir. 2010). But if a party files a motion for enlargement of time after a deadline has passed, the "good cause" standard becomes more stringent and a court should grant the motion only when the moving party missed the deadline because of "excusable neglect." Rule 6(b)(1)(B).

The Ninth Circuit has noted that "good cause" is not a high

hurdle. "'Good cause' is a non-rigorous standard that has been construed broadly across procedural and statutory contexts." *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d at 1259 (citations omitted).

Respecting the "excusable neglect" requirement, the Ninth Circuit applies a more rigorous standard that requires courts to "apply a four-factor equitable test, examining: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Id.* at 1261 (citing *Pioneer Inv. Servs. Co. v. Brunswich Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993) and *Briones v. Riviera Hotel & Casino*, 116 F.3d 379, 381 (9th Cir. 1997)). The test "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer*, 507 U.S. at 395. Weighing *Pioneer*'s equitable factors is left to the district court's discretion. *Pincay v. Andrews*, 389 F.3d 853, 860 (9th Cir. 2004) (en banc).

The Ninth Circuit has stated that a court errs in failing "to engage in the equitable analysis mandated by *Pioneer* and *Briones*[.]"

*Ahanchian*, 624 F.3d at 1261 (citing *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1224 (9th Cir. 2000)). And, in applying the analysis, courts "cannot create or apply any 'rigid legal rule against late filings attributable to any particular type of negligence[ ]'" by "impermissibly adopting a per se rule in applying the *Pioneer/Briones* balancing test." *Id.* at 1261-62 (citing *Bateman*, 231 F.3d 1220 and *Pincay*, 389 F.3d 853).

### D.  Analysis

Conducting the required equitable analysis, the Court first finds that allowing Kelley to file his SDF will result in minimal prejudice to Billings Clinic. "Prejudice requires greater harm than simply that relief would delay resolution of the case." *Lemoge v. U.S.*, 587 F.3d 1188, 1196 (9th Cir. 2009) (citing *TCI Group Life Ins. Plan v. Knoebber*, 244 F.3d 691, 701 (9th Cir. 2001) ("[M]erely being forced to litigate on the merits cannot be considered prejudicial for purposes of lifting a default judgment.")). Billings Clinic was aware that Kelley opposed its summary judgment motion on the merits. Including his responsive brief, Kelley filed more than 200 pages of documents – including

exhibits, affidavits, and deposition excerpts – in opposition to Billings Clinic's motion. Neither Billings Clinic nor its counsel can reasonably claim surprise that Kelley disputed Billings Clinic's version of material facts. That Kelley failed to timely file a SDF in accordance with the Local Rules does not hinder Billings Clinic's opportunity to argue that there are no genuine issues of material fact.

Second, the Court concludes that the length of delay involved in permitting Kelley to file his SDF is minimal, as is its potential impact on the proceedings. Kelley's counsel made Billings Clinic's counsel aware of the allegedly inadvertent omission within minutes of the filing of Billings Clinic's reply brief. Although this notice was about two weeks after the deadline for filing the SDF, such a delay, taken in context, is not great. This case has been pending in this Court for more than two years.

Also, as noted, Kelley attached his SDF as an exhibit to his brief in support of the instant motion. Thus, if the Court allows Kelley to file his SDF, Billings Clinic's pending summary judgment motion will be ready for ruling because, as noted, Kelley already filed with his

response brief more than 200 pages of documents supporting his opposition to the summary judgment motion. In short, there is no evidence that allowing the SDF to be filed late will have a significant impact on the proceedings.

Third, respecting the reason for Kelley's delay in filing his SDF and whether it was within the movant's reasonable control, Kelley has filed two affidavits from Daniel G. Gillispie. In the first affidavit, Mr. Gillispie, an attorney who previously represented Kelley and who now assists Kelley's substitute counsel, Jeffrey Simkovic, testifies that he inadvertently failed to file the SDF when electronically filing other documents in opposition to Billings Clinic's summary judgment motion. *First Gillispie Affidavit (ECF 72-1) at 2-3.* He states that he inadvertently failed to convert the SDF into a .pdf format. Consequently, he explains, he did not include the SDF with other documents that he electronically filed related to Kelley's summary judgment opposition. *Id. at 3.* Mr. Gillispie notes that he did not immediately discover his oversight even though he printed all of the documents for his office's file and for the Court's use. *Id. at 3.*

In his second affidavit, Mr. Gillispie refutes Billings Clinic's argument that he and Mr. Simkovic are not credible in their claim that the SDF was prepared at the time they filed Kelley's response. *Second Gillispie Affidavit (ECF 74-1) at 1-2.* He also attaches as exhibits to his affidavit emails he claims to have exchanged with Mr. Simkovic during preparation of Kelley's response to Billings Clinic's summary judgment motion in an attempt to establish that the SDF was prepared by the filing deadline. *Id.*

The Court concludes that Kelley's counsels' failure to timely file the SDF was inadvertent and not the product of bad faith, deviousness, or malicious intent. As is evident from Mr. Gillispie's affidavits, his error resulted from negligence and carelessness. Although Billings Clinic questions Kelley's counsels' veracity respecting whether the SDF was complete and ready for filing at the time Kelley filed his responsive materials, Messrs. Simkovic and Gillispie are officers of the Court who will be given the benefit of the doubt absent affirmative proof of lack of candor. There is no evidence that they have been dishonest with the Court or opposing counsel. Billings Clinic's belief that they may have

been is speculation. Their negligence and carelessness under the circumstances is not sufficiently egregious to warrant denying their motion to file their SDF beyond the deadline.

Fourth, the Court concludes that Kelley's counsel acted in good faith in this situation. As demonstrated by Mr. Gillispie's first affidavit, once he discovered his careless failure to file Kelley's SDF, he immediately notified counsel for the Billings Clinic and sought consent to file the SDF late. *ECF 72-1 at 4*. And as emphasized in his second affidavit, he had completely prepared the SDF at the time he filed Kelley's responsive documents in opposition to Billings Clinic's summary judgment motion. *ECF 74-1 at 2*. Nothing in the record suggests that Kelley's counsel acted in bad faith.

Under the circumstances, the Court is not inclined to "create or apply [a] rigid legal rule against late filings attributable to [Kelley's counsels'] negligence [by] impermissibly adopting a per se rule" that enforces Local Rule 56.1(d) under any situation regardless of application of the *Pioneer/Briones* balancing test. *See Ahanchian*, 624 F.3d at 1261-62. To do so would be directly contrary to controlling

Ninth Circuit authority and would be error.

Balancing the four factors discussed above, the Court concludes that Kelley's counsel carelessly missed the filing deadline for the SDF. Such carelessness is mitigated under the circumstances by lack of prejudice to Billings Clinic, minimal delay in the proceedings, and counsels' good faith carelessness in failing to meet the filing deadline. No bad faith has been shown to motivate counsels' error. Weighing the equities, the Court grants Kelley's motion and will direct that the Clerk of Court file Kelley's SDF found at ECF 71-1.

The Court does not by this ruling condone the failure to timely file required documents. But the Court also encourages counsel to remember the Standards of Professional Courtesy Among Attorneys, which include, among others, the admonition to "cooperate with opposing counsel in responding to all reasonable requests for scheduling accommodations, for extensions of time, and waiver of procedural formalities." *See 2013 Lawyers' Deskbook & Directory at 280.*

## II.   Billings Clinic's Summary Judgment Motion

## A.    __Background__[4]

On August 16, 2006, Kelley began working in Billings Clinic's

Emergency Department ("ED") as a Patient Care Technician ("PCT").

*Billings Clinic's Statement of Undisputed Facts (ECF 65) at ¶ 6.*  While

employed by Billings Clinic, Kelley participated in Billings Clinic's

Preceptor Program as an individual who was precepted and later as a

preceptor for other individuals.  *Id. at ¶ 12.*  As a PCT, Kelley was

supervised by Cheryl Christensen ("Christensen"), who was the ED's

manager at the time.  *Id. at ¶ 15.*

In December 2006, Kelley received a Bachelor's Degree in

Nursing.  *Id. at ¶ 31.*  On January 15, 2007, Christensen promoted

Kelley to a Graduate Nurse position.  *Id. at ¶ 32.*  On February 27,

---

[4]Consistent with summary judgment standards discussed below,
the following facts are taken from the materials of record.  The Court
views the facts and inferences from them in the light most favorable to
Kelley as the non-moving party.  *Matsushita Elec. Indus. Co. Ltd. v.
Zenith Radio Corp.*, 474 U.S. 574, 587-88 (1986); *Betz v. Trainer
Worthham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).  Because
of the Court's conclusions respecting Kelley's hostile work environment
and quid pro quo sexual harassment claims discussed *infra*, the Court
has attempted to limit this description of background facts to those
relevant to Kelley's retaliation claims and to those that lend context to
a discussion of those claims.

2007, Christensen promoted Kelley to a Registered Nurse ("RN")

position after he passed the Montana State Nursing Examination. *Id.*

*at ¶ 34.* As an RN, Kelley's terms and conditions of employment were

dictated by a collective bargaining agreement between Billings Clinic

and the union that represented Kelley. *Id. at ¶ 39.* At some point in

2007, Richard Mickelson ("Mickelson") became the ED's manager and

Kelley's supervisor. *Id. at ¶ 47.*

In 2009, Kelley applied for promotion to the Charge Nurse ("CN")

position in the ED. *Id. at ¶ 64.* Laurie Smith ("Smith") was clinical

coordinator for the ED at that time. *Id. at ¶ 65.* On September 21,

2009, after a hiring process that included a peer interview in which

some employees expressed concern about Kelley becoming CN because

of his limited experience, Mickelson hired Kelley to the CN position.

*Id. at ¶¶ 66-74.* The CN position was not a management position, but

Kelley did have some supervisory responsibilities as CN. *Id. at ¶ 75.*

During Kelley's time as CN, he had difficulties with some of the

other employees in the ED, including Laurie Big Medicine ("Big

Medicine"), Robbin Pollack ("Pollack"), and Desiree Cavan ("Cavan").

*Id. at ¶ 78.* In addition, Mickelson received reports about communications problems between Kelley and other employees and about Kelley's performance problems while Kelley was a CN. *See generally id. at ¶¶ 79-99.* Some of the problems arose during Kelley's participation as a preceptor in Billings Clinic's Preceptor Program. *Id. at 93-97.*

On February 14, 2011, Mickelson had a discussion with Kelley about Kelley's performance as a CN. During this conversation, Kelley stated that the CN position was not what he thought it was going to be. Mickelson offered Kelley the opportunity to resign from the CN position and Kelley decided to resign. *Id. at ¶ 100.* On the same day, Mickelson sent an email message to ED employees announcing that Kelley had resigned from the CN position to focus more time on direct patient care. Mickelson also stated, "On his behalf, [Kelley] apologizes if any episodes of communication were not optimal at the time." *Id. at 101.* Kelley agreed with the decision to resign from the CN position and he agreed with the content of Mickelson's email message. *Id. at ¶ 102.*

On February 18, 2011, Kelley met with Mary Ellen James

("James"), who was a director of human resources for Billings Clinic at the time. *Id. at ¶ 103.* At the meeting, among other ED concerns, Kelley complained about the following incidents:

> (1) On March 29, 2010, Kelley was hit by flying tampons while some of the ED staff were having a tampon fight. One of the nurses, Tara Zoanni ("Zoanni"), had a tampon up her nose (the "tampon incident");

> (2) Also on March 29, 2010, Kelley received a bogus page on his work pager to call a business called Tokyo Sauna. This page was sent to Kelley by Big Medicine and another ED nurse as a joke because, according to Kelley, Tokyo Sauna is a massage parlor that engages in prostitution (the "Tokyo Sauna incident");

> (3) On July 16, 2010, Kelley ordered pizza for the ED. The pizza came with garlic butter. Big Medicine got some of the garlic butter on the front of her scrubs. She allegedly rubbed her chest on Kelley, telling him he need some loving and that she was going to butter him up (the "breast

rubbing incident"); and

> (4)  Kelley also has asserted that in July 2010, a diagram of female genitalia was taped to his locker at Billings Clinic (the "vagina diagram incident").

*Id. at ¶¶ 105 and 159.*  Kelley also reported to James that he had sent Mickelson a message about the tampon incident and the Tokyo Sauna incident, but had received no response.  *Id. at ¶ 106.*

On April 3, 2010, Kelley had sent an email message to Mickelson complaining about a number of workplace issues, including the tampon incident and the Tokyo Sauna incident.  In the message, Kelley did not state that he was offended by these two incidents or that he believed they were sexual harassment.  Mickelson responded to Kelley's email message two days later, stating, "I'll start working on your list – try to relax a little ... it's ok."  Kelley responded to that message by stating, "Thanks for your kind words ... I'm just trying so hard to do what you and everyone else expect of me."  *Id. at ¶¶ 108 and 109.*

Also during Kelley's February 18, 2011 meeting with James, Kelley told James that he went to Mickelson in person to report the

breast rubbing incident and that Mickelson told Kelley that he would take care of it. *Id. at ¶ 110.* Mickelson has testified that Kelley told him about the incident, but noted that Kelley reported only that there was an incident involving pizza and garlic butter, not about Big Medicine's physical contact with Kelley. *Id. at ¶ 111.*

At the meeting, James: (1) gave Kelley a copy of Billings Clinic's sexual harassment policy; (2) told Kelley that she would begin a full investigation and asked him if she could contact him if she had additional questions; and (3) thanked Kelley for his time, told him he did the right thing by coming forward, and stated that she would be getting back to him about his complaint and the investigation. *Id. at ¶¶ 113-115.*

After her meeting with Kelley, James set about investigating Kelley's complaints. She met with, among others, Mickelson and his supervisor, Dave Bunkers ("Bunkers"), who is the Executive Director of Critical Care Services and Research for Billings Clinic. *Id. at ¶¶ 116-119.* Respecting the tampon incident and Tokyo Sauna incident, Mickelson told James that he was aware of those incidents and that he

had addressed them. *Id. at ¶¶ 120-123.* Respecting the breast rubbing incident, Mickelson stated that he was aware of it. But he said that Kelley had reported to him only that there was an incident involving pizza and butter. He said Kelley did not report anything about Big Medicine having physical contact with him or telling him that he needed some loving. *Id. at ¶ 124.*

On March 1, 2011, James met with Big Medicine. She denied rubbing her chest on Kelley or making the alleged comment to him. *Id. at ¶¶ 125-128.* Big Medicine admitted that she and another nurse sent the bogus Tokyo Sauna page to Kelley, stated that they were being silly, and agreed that it was inappropriate to send it. *Id. at ¶ 129.* Big Medicine also explained that the tampon incident occurred when tampons were placed in her purse as a joke. Zoanni put a tampon in her nose. Kelley laughed when he saw what they were doing. Zoanni threw a tampon at Kelley and it landed on a desk. *Id. at ¶ 130.*

On March 2, 2011, James spoke by telephone with nurse Rebecca Frye ("Frye"). *Id. at ¶ 131.* Kelley reported to James that Frye may have witnessed the breast rubbing incident. *Id. at ¶ 106.* Frye told

James that she did not witness the incident, but had heard about it. *Id. at ¶¶ 132-133.* Frye said that she heard the incident was of a sexual nature but she could not recall any specific comments or details about it. *Id. at ¶ 134.*

On March 17, 2011, James met with Kelley to go over the results of her investigation. She also prepared a memorandum to Kelley explaining the results and gave him a copy after the meeting. *Id. at ¶¶ 135-138.* In the memorandum, James explained her findings as they are described above. *Id. at ¶¶ 139-141.* She thanked Kelley for bringing the matters to her attention, and requested that he report any further concerns to her or Mickelson. *Id. at ¶ 142.*

In this meeting with James, Kelley reported that he once left his work email account open. He believed that Big Medicine and another nurse, Robin Pollock, used his email account to send an email message to a male physician, purportedly from Kelley, requesting a sexual encounter with the physician (the "email incident"). *Id. at ¶¶ 143-144.* When the physician asked Kelley about the email message about one day later, Pollock was present and stated to Kelley that the incident

would teach Kelley to leave his email account open around her at work. *Id. at ¶ 147.* Kelley told James that he did not want to pursue this issue. *Id. at ¶ 151.*

Kelley asked James if she considered the matter closed. She stated that she did. Kelley thanked James for her work on his complaint and report. *Id. at ¶¶ 152-153.*

James followed up with a memorandum to Big Medicine. In it, she explained that she could not substantiate Kelley's claim of sexual harassment, but that Big Medicine had admitted to sending the bogus, inappropriate page. James advised Big Medicine that Mickelson would be taking appropriate disciplinary action regarding the incident. *Id. at ¶¶ 155-156.* On June 20, 2011, Mickelson issued a formal verbal warning to Big Medicine regarding the Tokyo Sauna incident. *Id. at ¶ 158.*

On February 13, 2011, that is, six days before Kelley went to see James to complain about the incidents described above, John Kuper, Billings Clinic PCT, sent Mickelson an email message reporting the possible use of excessive force by a nurse on a patient. Although Kuper

did not name the nurse in the email, he was referring to Kelley. On February 15, 2011, Kuper spoke with Mickelson about his report regarding Kelley. He provided details of the incident and Mickelson told Kuper he would look into it. *Id. at ¶¶ 165-168.*

On February 26, 2011, Mickelson, because he had been receiving reports of communications problems between Kelley and Big Medicine, decided to go into work to monitor the situation. It was a Saturday evening. Kelley was scheduled to work that evening, but he had called in sick. While Mickelson was working in the ED that evening, three radiology technicians – Greg Hanberg ("Hanberg"), Tiffany Richmond ("Richmond"), and Andy Taylor ("Taylor") – approached him to discuss an incident that had occurred during the previous work shift. *Id. at ¶¶ 170, 172-173.*

The three described an incident in which they had a patient who was not cooperating with an examination. They called Kelley for assistance. He entered the room, twisted the patient's arm repeatedly until he screamed, and told the patient to hold still. Hanberg reported that this was not the first time Kelley had done this. *Id. at ¶ 174.*

At Mickelson's request, Hanberg sent him an email message on behalf of the three radiology technicians. In it, Hanberg reported that they were trying to conduct scans on an intoxicated patient at 5:00 a.m. the previous morning and the patient was being combative. They contacted Kelley and asked if soft restraints could be used to control the patient. Kelley came into the room without the restraints and hyperflexed the patient's wrists until he began to scream and yell in pain. Kelley continued to do this until the patient stated that he would hold still. *Id. at ¶¶ 175-177.* Hanberg also reported that this incident was not the first time that Kelley had been observed treating a patient in this manner. Several weeks earlier, they had another highly intoxicated patient, and Kelley hyperflexed the patient's left index finger and rubbed his knuckles across the patient's sternum to force the patient to cooperate. *Id. at ¶ 179.* Mickelson received a similar report from Richmond. *Id. at ¶ 182.* Kelley knew Hanberg, Richmond, and Taylor professionally from working with them, but not otherwise, and he did not have any specific knowledge as to the reason they reported this information about him. *Id. at ¶¶ 181, 183-184.*

Mickelson, having received these reports, recalled Kuper's report about Kelley and asked Kuper for more details. Kuper sent Mickelson an email message that same day detailing the incident he had previously reported. Kuper reported that they were dealing with a patient who had overdosed and was slightly uncooperative but not threatening. Kuper reported that Kelley entered the room, grabbed the patient's wrist and arm, and forced it above his shoulder. The patient cried out in pain, opened his eyes, and stated that what was being done to him was extremely painful. Kuper stated that the patient began crying and Kelley told the patient that he had better start cooperating. *Id. at ¶¶ 185-188.*

On February 28, 2011, Mickelson contacted his supervisor, Bunkers, and informed him of the complaints he had received about Kelley's conduct toward patients. They discussed the need for an investigation. On March 1, 2011, Mickelson and Bunkers met with Kelley to discuss the complaints and to conduct a preliminary investigation. Mickelson handed Kelley the charts for two of the patients involved. Kelley denied all of the allegations, but admitted

that he did grab a patient's arm to place it under a strap on a backboard. Bunkers explained to Kelley that the reports were very serious and told him that they would be back in touch with Kelley about them. *Id. at ¶¶ 189-192.*

On March 3, 2011, Mickelson and Bunkers met with Lu Byrd ("Byrd"), Vice President of Hospital Operations and Chief Nursing Officer for Billings Clinic, to discuss the complaints about Kelley. They decided to put Kelley on paid administrative leave while a full investigation was conducted. Bunkers called Kelley that day and told him he was being placed on paid administrative leave during the investigation. The next day, March 4, 2011, Bunkers sent Kelley a letter informing him in writing that he was on paid administrative leave. *Id. at ¶¶ 193-195.*

On March 7, 2011, Byrd and Bunkers interviewed Hanberg, Taylor, Richmond, and Kuper regarding their reports about Kelley. They confirmed the details of their complaints and provided some additional information. On March 9, 2011, Bunkers interviewed another nurse, Tami Grewell ("Grewell") because she was present

during one of the incidents involving Kelley. Grewell reported that she had observed Kelley mistreat two different patients during two different incidents by grabbing their arms, twisting them, and putting them behind the patients' heads. Both patients began to scream and cry. Kelley also pushed very aggressively on the noses of these patients to get them under control. *Id. at ¶¶ 196-198.*

On March 16, 2011, Byrd, Bunkers, and others met with Kelley to discuss the complaints about Kelley. Byrd explained the incidents of alleged patient abuse reported by Kelley's co-workers, asked Kelley to explain, and gave him an opportunity to respond. Kelley stated that he did grab a patient's arm to secure it under straps of a backboard, but denied repeatedly hyperflexing a patient's writs and using hyperflexion as a control technique. He stated that he had put patients' arms behind their heads, but noted that is what he was taught while working for Billings Clinic. *Id. at ¶¶ 200-203.*

Also during this meeting, Kelley brought up the complaint he had made to James. Byrd responded stating that his complaint to James was a separate issue that had to be handled separately from the

current investigation. She noted that Kelley was obligated as a professional to keep any such human resources issues separate from his care of patients, and Kelley agreed. He did not admit, however, to the allegations of misconduct that had been reported. *Id. at ¶ 204*.

On April 7, 2011, Byrd, Bunkers, and others met again with Kelley about the investigation into his alleged misconduct. Byrd stated that she had reviewed all of the material that Billings Clinic used in training and its applicable policies, and could not find anything that supported the techniques Kelley used on the patients in question. She also stated that Kelley's behavior was inappropriate. Byrd stated that she could not trust that Kelley would not do this again. Byrd stated that she had decided to terminate Kelley's employment with Billings Clinic. *Id. at ¶¶ 207-209*. Billings Clinic terminated Kelley's employment that day. *Id. at ¶ 212*.

Kelley did not file a grievance under the CBA regarding either his sexual harassment allegations or his discharge. *Id. at ¶¶ 220-221*. On June 10, 2011, Kelley filed a discrimination charge with the Montana Human Rights Bureau ("MHRB") and the Equal Employment

Opportunity Commission ("EEOC"). He claimed hostile work environment sexual harassment and retaliation. He did not claim quid pro quo sexual harassment. The MHRB investigated Kelley's claims. *Id. at ¶¶ 222-224, 226.*

On December 6, 2011, the MHRB issued its Final Investigative Report. *Id. at ¶ 225.* It determined that Kelley's hostile work environment sexual harassment claim was untimely and that it, therefore, lacked jurisdiction over it. *Id. at ¶ 227.* It also found "no cause" respecting Kelley's retaliation claim. It concluded that Billings Clinic had a legitimate, non-discriminatory reason for discharging Kelley that was not a pretext for retaliation. *Id. at ¶ 228.* On January 6, 2012, the EEOC issued a Dismissal and Notice of Rights on Kelley's charge, adopting the MHRB's findings. *Id. at ¶ 229.*

### B. Parties' Arguments

Billings Clinic argues that it is entitled to summary judgment on all of Kelley's claims because: (1) Kelley's hostile work environment sexual harassment claims under both Title VII and the MHRA are time-barred, *Billings Clinic's Br. (ECF 64) at 9-11*; (2) Kelley cannot

establish a prima facie case of hostile work environment sexual harassment under either Title VII or the MHRA, *id. at 11-17*; (3) even if Kelley could establish a prima facie case of hostile work environment sexual harassment, Billing Clinic is not liable because Kelley cannot show that it knew or should have known about the harassment and failed to take steps reasonably calculated to end it, *id. at 18-21*; (4) Kelley has failed to exhaust administrative remedies respecting his quid pro quo sexual harassment claims under both Title VII and the MHRA, *id. at 21-23*; (5) Kelly cannot establish a quid pro quo sexual harassment claim under either Title VII or the MHRA because the persons he claims harassed him were coworkers with no power to take a tangible employment action against him, *id. at 23-24*; (6) Kelley cannot establish a prima facie case of retaliation under either Title VII or the MHRA because he cannot show a causal connection between a protected activity and an adverse employment action, *id. at 25-26*; (7) even if Kelley could establish a prima facie case of retaliation, his retaliation claims fail because he cannot establish that, but for his sexual harassment claim, he would not have been fired, *id. at 26-28*;

and (8) Kelley cannot establish a tortious interference claim under Montana law, *id. at 28-30*.

Kelley responds that: (1) his hostile work environment sexual harassment claims under Title VII and the MHRA are not time-barred because he is entitled to equitable tolling of the limitations periods, *Kelley's Resp. Br. (ECF 68) at 16-17*; (2) fact issues preclude summary judgment on his hostile work environment sexual harassment claims, *id. at 17-18*; (3) his quid pro quo sexual harassment claim is not subject to summary judgment because Billings Clinic's inaction respecting his complaints to Mickelson required Kelley to accept the inappropriate behavior or be forced to resign, *id. at 18-19*; (4) his quid pro quo claim is not barred by failure to exhaust administrative remedies because they have the same facts as his hostile work environment claims, *id. at 19-20*; (5) his retaliation claims are not subject to summary judgment because there exists a causal link between his protected activity and the adverse employment action he endured, *id. at 2-9*; (6) summary judgment on his retaliation claims is precluded because there exist genuine issues of material fact respecting whether his discharge

resulted from filing a sexual harassment claim or because he abused patients, *id. at 9-16*; and (7) he concedes he does not have sufficient evidence to create a triable issue on his claim for tortious interference and does not oppose its dismissal without prejudice, *id. at 21*.

In reply, Billings Clinic argues: (1) Kelley has not established a basis for equitable tolling of the limitations periods respecting his hostile work environment sexual harassment claims, *id. at 3-6*; (2) Kelley was not subjected to incidents of sexual harassment after July 2010, which makes his claims time-barred, *id. at 7-8*; (3) Kelley has not established a prima facie case of hostile work environment sexual harassment, *id. at 8*; (4) Billings Clinic cannot be held liable for these claims because it took steps reasonably calculated to end any alleged harassment and Kelley did not respond to this position by Billings Clinic, thus conceding it, *id. at 8-9*; (5) Kelley did not exhaust his administrative remedies respecting his quid pro quo claims because hostile work environment claims are different from quid pro quo claims, the dates of the acts involved are different, the alleged perpetrators are different, and the locations of the alleged harassment are different, *id.*

*at 9-11*; (6) Kelley's quid pro claim is neither factually nor legally supported, *id. at 11-13*; (7) Billings Clinic is entitled to summary judgment on Kelley's retaliation claims because Kelley has not established a prima facie case and has not established that Billings Clinic fired him because of his sexual harassment complaint, *id. at 13-17*; and (8) Kelley concedes his tortious interference claim should be dismissed, *id. at 17, n.2.*

## C. <u>Summary Judgment Standard</u>

Fed. R. Civ. P. 56(a) requires the court to grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Entry of summary judgment is appropriate "against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. A moving party without the ultimate burden of persuasion at trial has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish a genuine issue as to any material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. *Id.* at 587 (quotation omitted). In resolving a summary judgment motion, the evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587 (citation omitted).

D.    <u>**Analysis**</u>

### 1. Kelley's Hostile Work Environment Sexual Harassment Claims under Title VII and the MHRA are Time-Barred

To maintain hostile work environment sexual harassment claims in this action under Title VII and the MHRA, Kelley first had to file administrative charges with the EEOC and the MHRB. *See* 42 U.S.C. § 2000e-5(f)(1) and MCA § 49-2-512, respectively. "Title VII establishes two potential time limitations periods within which a plaintiff must file an administrative charge with the EEOC." *MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1081 (9th Cir. 2006) (citing 42 U.S.C. § 2000e-5(e)(1)). "Generally, a Title VII plaintiff must file an administrative charge with the EEOC within 180 days of the last act of discrimination. However, the limitations period is extended to 300 days if the plaintiff first institutes proceedings with a 'State or local agency with authority to grant or seek relief from such practice.'" *Id.* at 1081-82 (citing 42 U.S.C. § 2000e-5(e)(1)). Kelley first instituted proceedings with a State agency with the requisite authority. Thus, he had 300 days from the last act of discrimination to file an administrative charge with the EEOC. Under the MHRA, a plaintiff

must file an administrative charge within 180 days after the allegedly discriminatory act occurred or was discovered. MCA § 49-2-501(4).

Kelley claims that he was exposed to a hostile work environment beginning in approximately October of 2009. *ECF 31 at ¶ 3.* He maintains that the following incidents of sexual harassment, described above, occurred before Billings Clinic fired him on April 7, 2011.

First, Kelley alleges that on March 13, 2010, a co-worker, without his permission, sent from Kelley's work email account an email to an emergency room physician. In the email, Kelley was purportedly confessing to a romantic attraction to the physician, who regarded the email as extremely inappropriate. *Id. at ¶ 9; see also ECF 65-2 at 82-87 and ECF 65-36.*

Next, Kelley alleges that on March 29, 2010, two incidents involving sexual harassment occurred. The first involved three female co-workers throwing tampons around the nurses' station and at Kelley. *ECF 31 at ¶ 4.* The second involved a bogus page Kelley received on his charge nurse pager asking him to call a number for an emergency message. The number Kelley was asked to call was a massage parlor in

Billings.  And there was no emergency.  *Id. at ¶ 5.*

Kelley also alleges that another incident of sexual harassment occurred around July 2010.  It involved a diagram of female genitalia being taped to Kelley's locker at the hospital.  *Id. at ¶ 8.*  The diagram was copied from a book and had handwriting on it.  Kelley was told by a co-worker that two other co-workers had placed the diagram on his locker.  *ECF 65-2 at 97-99.*

Finally, Kelley alleges that on July 6, 2010, members of the emergency room staff were eating pizza.  One of Kelley's female co-workers, Big Medicine, had garlic butter on the front of her scrubs.  She rubbed her breasts against Kelley and stated to him words to the effect that "you just need some loving and let me butter you up."  *ECF 31 at ¶ 7.*  Kelley considered this to be a sexual advance.  *ECF 65-2 at 100.*

Kelley has not alleged in his Second Amended Complaint any other incidents of sexual harassment that occurred after the July 6, 2010 incident.  *See ECF 31.*  And he admits that he "cannot cite any concrete examples of behavior as inappropriate as Big Medicine rubbing her breasts against me that occurred after July of 2010."  *Aff.*

*of Mark Kelley (ECF 68-2) at ¶ 14.*   But he does believe that he "continued to encounter hostile attitudes from the same individuals throughout [his] time as charge nurse, and believe[s] this hostile attitude was motivated, in part, by their attitudes about [his] sex." *Id*.

Because the last incident of sexual harassment that Kelley alleges occurred on July 6, 2010, Kelley was required to file his administrative charges with the MHRA in January of 2011, and with the EEOC by May 2, 2011. *See* MCA § 49-2-501(4) and 42 U.S.C. § 2000e-5(e)(1)).  He filed his administrative charge, however, on June 10, 2011. *ECF 65-21 at 2.*  Thus, his hostile work environment claims under both the MHRA and Title VII are unexhausted and time-barred.

Kelley seeks to avoid the time bar by claiming entitlement to equitable tolling of the limitations periods.  He first argues that emergency room manager Rich Mickelson assured him that he was addressing Kelley's harassment complaints, thus suggesting that Billings Clinic "induced or tricked" Kelley to allow the filing deadline to pass. *ECF 68 at 16* (citing *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96 (1990)).  Kelley included this allegation in his Second

Amended Complaint by asserting that "Mickelson requested that Kelley not present these issues to any higher level of authority, stating that as long as Kelley was a charge nurse he could not go to human resources regarding these concerns." *ECF 31 at ¶ 10.*

Second, Kelley argues that his hostile work environment claims are timely because "there is evidence that the work environment remained hostile until the very end of his employment[.]" *Id. at 16-17.* As examples, Kelley states in his brief that Mickelson sent an email on February 26, 2011, to Big Medicine. The email addressed Big Medicine's behavior toward Kelley. He also notes that another co-worker, on March 2, 2011, stated to a Billings Clinic employee investigating Kelley's harassment complaint that "things were difficult for [Kelley] in the ER because he was one of the few men working nights." *Id. at 17.* Finally, Kelley notes that Big Medicine was not finally disciplined for her conduct until June 20, 2011, indicating that Billings Clinic "unjustifiably delayed any action against her for that period[.]" *Id.*

The Court concludes that the limitations periods of Kelley's

hostile work environment claims under the MHRA or Title VII are not subject to equitable tolling. Respecting Kelley's claim to the extent it is brought under Title VII, it is true that "statutory time limits applicable to lawsuits against private employers under Title VII are subject to equitable tolling." *Irwin*, 498 U.S. at 457, n.2 (citing *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 394 (1982)). But "[f]ederal courts have typically extended equitable tolling only sparingly." *Id.* For instance, "the Supreme Court has allowed equitable tolling when the statute of limitations was not complied with because of defective pleadings, when a claimant was tricked by an adversary into letting a deadline expire, and when the EEOC's notice of the statutory period was clearly inadequate." *Scholar v. Pacific Bell*, 963 F.2d 264, 267-68 (9th Cir. 1992) (citing *Irwin*, 498 U.S. at 96 and *Baldwin County Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984) (per curiam)). "Courts have been generally unforgiving, however, when a late filing is due to claimant's failure "to exercise due diligence in preserving his legal rights." *Id.* (quoting *Irwin*, 498 U.S. at 96).

The record here does not support application of equitable tolling

of the limitations period. In support of his argument that Mickelson "induced or tricked" him into letting the filing deadline pass, Kelley testifies in his affidavit that "Mickelson ... discouraged me from presenting my complaints to Billings Clinic's human resources department ... to preserve the cliquish and insular culture of the emergency department, possibly even at the expense of the quality of patient care." *ECF 68-2 at ¶ 6.* And he states that Mickelson told him to "relax" and assured Kelley that he was "working on it[ ]" when Kelley informed him of the incidents of sexual harassment. *Id. at ¶ 10.*

The Court first concludes that the conduct by Mickelson that Kelley describes does not give rise to equitable tolling under the foregoing authority. By Kelley's own version of events, Mickelson "requested" that Kelley not present his complaints of sexual harassment "to any higher level of authority" and "discouraged" Kelley from raising his complaints to the human resources department at Billings Clinic so that he could attempt to address Kelley's complaints. Even if true, Mickelson's conduct cannot reasonably be construed as inducement or trickery sufficient to support the doctrine of equitable

tolling of the limitations period. As this Court has noted, a limitations period cannot be tolled "every time an [employer] gives a reason for its employment decisions that an employee deems to be pretextual ... otherwise the equitable tolling exception would swallow the ... limitations rule." *Christison v. Alvarez*, 31 F.Supp.2d 787, 790 (D. Mont. 1999) (citing *Blumberg v. HCA Management Co.*, 848 F.2d 642, 644 (5th Cir. 1988)).

Second, the Court concludes that the record does not support Kelley's argument that his hostile work environment claims are timely because he was subjected to additional incidents of sexual harassment up until the date he was fired – April 7, 2011. As noted, he has conceded that he has no evidence of "any concrete examples of behavior as inappropriate as [his co-worker] rubbing her breasts against [him] that occurred after July of 2010." *Aff. of Mark Kelley (ECF 68-2) at ¶ 14.* And, Kelley has not alleged in his Second Amended Complaint any other incidents of sexual harassment that occurred after the July 6, 2010 incident. *See ECF 31.* Although he makes general, conclusory statements in his affidavit regarding the work place that post-date July

2010, he offers no admissible evidence. *ECF 68-2 at ¶ 14.* Instead, he merely states his agreement with a hearsay statement of a co-worker that it was difficult for Kelley to be one of the males on night shifts. The co-worker statement is hearsay and the Court cannot consider it in addressing the summary judgment motion at hand. *See* Fed. R. Evid. 801(c) and 802; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002). And Kelley, as indicated, offers no evidence of specific incidents of alleged sexual harassment occurring after July 2010.

Finally, Kelley's counsel raises similar statements in Kelley's brief in response to Billings Clinic's summary judgment motion. But briefs are not evidence. *British Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978) ("[L]egal memoranda ... are not evidence, and they cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion where no dispute otherwise exists."). Thus, Kelley has presented no admissible evidence that sexual harassment continued beyond July 6, 2010.

Respecting Kelley's hostile work environment claim to the extent it is brought under the MHRA, the Court again concludes that

equitable tolling is not appropriate to arrest the limitations period. The Montana Supreme Court has noted that equitable tolling applies when an "injured person has several legal remedies and, reasonably and in good faith, pursues one." *Hash v. U.S. West Communications Services*, 886 P.2d 442, 446 (Mont. 1994) (citations omitted). Here, Kelley cannot meet this requirement because his only remedy for his claim under Montana law is under the MHRA. *See* MCA §49-2-512(1). Because Kelley did not have several legal remedies – and because he failed to timely file his administrative charge with the MHRB in any event – equitable tolling is not applicable. *Id*.

For all of the foregoing reasons, the Court concludes that Kelley's hostile work environment sexual harassment claims are time-barred. Thus, Billings Clinic's summary judgment motion should be granted. Because of this conclusion, the Court does not reach Billings Clinic's remaining arguments supporting summary judgment on Kelley's hostile work environment sexual harassment claims.

2.     **Billings Clinic is Entitled to Summary Judgment on Kelley's Quid Pro Quo Sexual Harassment**

**Claims Because the Court Lacks Subject Matter Jurisdiction Over Them**

Billings Clinic seeks summary judgment on Kelley's quid pro quo sexual harassment claims brought under Title VII and the MHRA for two reasons.  First, it argues that Kelley failed to exhaust his administrative remedies.  *ECF 64 at 21-23 and ECF 70 at 9-11.* Second, it argues that Kelley cannot establish quid pro quo sexual harassment.  *ECF 64 at 23-24 and ECF 70 at 11- 13.*  The Court finds Billings Clinic's first argument dispositive.  For the reasons discussed below, the Court concludes that, under Ninth Circuit authority, Kelley did not exhaust his administrative remedies respecting his quid pro quo claims and, therefore, this Court lacks subject matter jurisdiction over them.

Quid pro quo or so-called "tangible employment action" sexual harassment requires that an employer "explicitly or implicitly condition[ed] a job, job benefit, or the absence of a job detriment, upon [the] employee's acceptance of sexual conduct." *Craig v. M&O Agencies, Inc.*, 496 F.3d 1047, 1054 (9th Cir. 2007) (citation omitted).  Billings Clinic argues that Kelley filed an administrative charge claiming

hostile work environment sexual harassment and retaliation, but that he did not claim quid pro quo sexual harassment. *ECF 64 at 22.* It also argues that quid pro quo claims are not sufficiently like or reasonably related to Kelley's administrative charge claims to permit the Court to conclude that the quid pro quo claims are exhausted. *ECF 70 at 9-11.*

For subject matter jurisdiction to exist over Kelley's quid pro quo claims, he "was required to exhaust his administrative remedies by either 'filing a timely charge with the EEOC, or [with] the appropriate state agency, thereby affording the agency an opportunity to investigate the charge.'" *Freeman v. Oakland Unified Sch. Dist.*, 291 F.3d 632, 636 (9th Cir. 2002) (quoting *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1099 (9th Cir. 2002) and citing *EEOC v. Farmer Bros. Co.*, 31 F.3d 891, 899 (9th Cir. 1994)). The exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision." *Id.* (quoting *B.K.B.*, 276 F.3d at 1099). Federal courts require "strict adherence" to the exhaustion requirement. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002). "[S]trict

adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Id.* (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980)).

In this case, it is undisputed that Kelley did not expressly include a quid pro quo sexual harassment claim in his administrative charge. The Ninth Circuit has set forth the following standard for determining whether a plaintiff has exhausted administrative remedies respecting claims not included in the original EEOC charge:

> Even when an employee seeks judicial relief for claims not listed in the original EEOC charge, the complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge. Although allegations of discrimination not included in a plaintiff's EEOC charge generally may not be considered by a federal court, subject matter jurisdiction extends over all allegations of discrimination that either fell within the scope of the EEOC's actual investigation or an EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.
>
> We consider [a] plaintiff's civil claims to be reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case. And while it is true that we construe the language of EEOC charges with utmost liberality since they are made by those unschooled in the technicalities of formal pleading, there is a limit to such judicial tolerance when principles of notice and fair play are involved.
>
> In determining whether the exhaustion requirement

has been satisfied, it is appropriate to consider such factors
as the alleged basis of the discrimination, dates of
discriminatory acts specified within the charge, perpetrators
of discrimination named in the charge, and any locations at
which discrimination is alleged to have occurred. The
crucial element of a charge of discrimination is the factual
statement contained therein.

*Freeman*, 291 F.3d at 636 (citations and internal quotations omitted).

Kelley argues that his "quid pro quo claims and hostile work
environment claims implicate the same players, the same events, the
same locations – the same facts." *ECF 68 at 20*. He also argues that
"[b]arring his quid pro quo claims would not be consistent with the
policy of liberally construing the matters set forth in the original
charge." *Id*. And, he argues without any explanation or elaboration,
that Billings Clinic would suffer no prejudice were the Court to permit
his quid pro quo claim to proceed in this action. The Court is not
persuaded.

First, Kelley has overlooked an important detail in attempting to
link his quid pro quo claims with his hostile work environment claims.
The hostile work environment claims in Kelley's EEOC charge, as the
Court concluded above, were not timely. And equitable tolling of the

limitations period is not applicable.  Thus, his hostile work environment claims are unexhausted and of no help to Kelley in asserting exhaustion of his arguably "like or reasonably related" quid pro quo claims.  As this Court recently stated in concluding that it lacked subject matter jurisdiction over an unexhausted claim that the plaintiff attempted to link to a similar but equally unexhausted claim:

> The "like or reasonably related to" exception to the exhaustion requirement may allow a court to consider an unexhausted claim if it is reasonably related to an exhausted claim, but it says nothing about allowing a plaintiff to proceed with an unexhausted claim that is related to another unexhausted claim.

*Finley v. Salazar*, 2013 WL 1209942, at *10 (D. Mont., Mar. 5, 2013), *adopted* in 2013 WL 1209940 (D. Mont., Mar. 25, 2013).

Here, because the hostile work environment claims to which Kelley seeks to link his quid pro quo claims are themselves untimely and thus unexhausted, the "like or reasonably related to" exception to the exhaustion requirement is not available.  *Finley*, *supra*.  In so concluding, the Court notes that Kelley argues only that his quid pro quo and hostile work environment claims are factually similar.  He makes no effort in his brief to attempt to show similarities between his

-50-

quid pro quo and retaliation claims. Courts, as neutral arbiters, generally should not "manufacture arguments for [a party]" that are not included in its brief. *Independent Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

Second, as noted, Kelley argues that barring his quid pro quo claims would be inconsistent with the policy of liberal construction of his administrative charge's language. The Ninth Circuit, in emphasizing that the language of charges is to be construed "with utmost liberality[,]" explained that such charges are "made by those unschooled in the technicalities of formal pleading." *B.K.B.*, 276 F.3d at 1100 (citing *Kaplan v. Int'l Alliance of Theatrical & Stage Employees*, 525 F.2d 1354, 1359 (9th Cir. 1975) *abrogated on other grounds by Laughon v. Int'l Alliance of Theatrical Stage Employees*, 248 F.3d 931 (9th Cir. 2001); *cf. Love v. Pullman Co.*, 404 U.S. 522, 527 (1972) (stating that "technicalities are particularly inappropriate in a statutory scheme [such as Title VII] in which laymen, unassisted by trained lawyers, initiate the process"). But here, the policy of construing the charge's language with "utmost liberality" carries less significance because

Kelley was represented by counsel when filing his administrative charge. *ECF 65-21*. If Kelley's counsel had wished to include quid pro quo claims in the administrative charge, he easily could have done so.

Finally, as noted, Kelley argues that Billings Clinic would suffer no prejudice if he is now permitted to proceed with an unexhausted claim. But he states no basis and cites no authority for this position. In light of "the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision[,]" *B.K.B*, 276 F.3d at 1099, the Court is not persuaded that Billings Clinic would suffer no unfair prejudice as Kelley suggests if Kelley were permitted to proceed in this action with his unexhausted quid pro quo claims.

For the foregoing reasons, summary judgment in Billings Clinic's favor on Kelley's quid pro quo clams is appropriate. Because of this conclusion, the Court does not reach Billings Clinic's remaining arguments supporting summary judgment on Kelley's quid pro quo claims.

### 3. <u>Genuine Issues of Material Fact Preclude Summary Judgment Respecting Kelley's</u>

## Retaliation Claims

Billings Clinic argues that summary judgment respecting Kelley's retaliation claims is appropriate. First, it argues that Kelley cannot establish a prima facie case of retaliation because he cannot prove a causal connection between protected activity and any adverse action against him. *ECF 64 at 25-26*. Second, Billings Clinic argues that, even if Kelley can establish a prima facie case for his retaliation claims, the claims are without merit because it can articulate a legitimate, non-retaliatory reason for the adverse employment action and Kelley cannot show that the reason is a pretext for retaliation. *Id. at 26-28*.

### a. Kelley Has Established a Prima Facie Case of Retaliation

In the Ninth Circuit, "[t]he requisite degree of proof necessary to establish a prima facie case for Title VII ... claims on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987), cert. denied, 498 U.S. 939 (1990)). A plaintiff need only offer evidence which "gives rise to an inference of unlawful

discrimination." *Id.* (citation omitted). "The amount [of evidence] that must be produced in order to create a prima facie case is 'very little.'" *Id.* (citations omitted). "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

To establish a prima facie case of retaliation, Kelley must show that he "engaged in protected activity, that [he] suffered a materially adverse action, and that there was a causal relationship between the two." *Westendorf v. West Coast Contractors of Nevada, Inc.*, 712 F.3d 417, 422 (9th Cir. 2013) (citing *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006) and *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140–41 (9th Cir. 2001)).

Here, Billings Clinic argues only that Kelley cannot establish the causation element of a prima facie case. *ECF 64 at 25-26.* Thus, Kelley "must establish that his ... protected activity was a but-for cause of the alleged adverse action by" Billings Clinic. *University of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S.Ct. 2517, 2534 (2013). In doing so,

Kelley must show that his "protected conduct was a but-for cause – but not necessarily the only cause – of [his] termination." *Westendorf*, 712 F.3d at 422 (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002)).

"Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases." *Bell v. Clackamas County*, 341 F.3d 858, 865-66 (9th Cir. 2003) (citations omitted). "But timing alone will not show causation in all cases; rather, in order to support an inference of retaliatory motive, the termination must have occurred fairly soon after the employee's protected expression." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002) (internal quotation marks omitted) (quoting *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009-10 (7th Cir. 2000)). The Ninth Circuit generally has held that a period of less than three months between a plaintiff's protected activity and an adverse employment action is sufficient to raise an inference of causation. *See, e.g.*, *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1111, 1113 (9th Cir. 2003) (interval of less than a

month between protected activity and adverse action sufficient for causal link); *Bell*, 341 F.3d at 865–66 (9th Cir. 2003) (holding that temporal proximity supported causal link where plaintiff was placed on administrative leave about three weeks after complaining, was returned to duty and placed back on leave almost three months after complaining and was ultimately terminated seven months after complaining); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (sufficient causation evidence found when adverse action taken less than three months after a complaint was filed, two weeks after the charge was first investigated, and less than two months after the investigation ended).

In the case at hand, on February 18, 2011, Kelley met with James, a director of human resources at Billings Clinic, to complain about the incidents discussed above that he perceived to be sexual harassment against him. *ECF 65 at ¶¶ 103 and 105.* On March 3, 2011, Billings Clinic placed Kelley on paid administrative leave while a full investigation was conducted concerning complaints about Kelley's conduct toward patients in the ED. *Id. at ¶¶ 193-194.* On April 7,

2011, Billings Clinic fired Kelley. *Id. at ¶ 212*. The Court concludes that, applying the foregoing authority to these facts, the temporal proximity of Kelley's protected activity to Billings Clinic's adverse employment action against him – that is, about six weeks – establishes a causal link to make out a prima facie case of retaliation.

### b. Fact Issues Preclude Summary Judgment on Kelley's Retaliation Claim

The Court concludes that genuine issues of material fact preclude summary judgment respecting Kelley's retaliation claim. Once a plaintiff establishes a prima facie case of discrimination in Title VII cases, as Kelley has done here, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Here, the record reflects that Billings Clinic fired Kelley for allegedly abusing patients by using excessive force on them to get them to comply with testing and procedures in the ED. The Court concludes that there this appears to be a legitimate, nondiscriminatory reason for Billings Clinic to fire an RN.

Once the employer meets its burden, as Billings Clinic has here,

the plaintiff must present evidence that the employer's stated reasons are pretextual. *Id*. at 804. And "[s]ummary judgment is not appropriate if, based on the evidence in the record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's" protected activity. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006).

In this case, the Court concludes that genuine issues of material fact exist respecting whether Billings Clinic's stated reasons for firing Kelley are pretextual. As noted, the temporal proximity of Kelley's complaint to James, a Billings Clinic human resources director, with Kelley's termination from employment, is relatively close. Also, there is evidence in the record that suggests that Kelley's termination may have been somehow related, at least in part, to problems he was having with co-workers in the ED that included his complaints about perceived sexual harassment. Thus, the Court will recommend that Billings Clinic's summary judgment motion be denied to the extent it relates to Kelley's retaliation claims.

### 4. Kelley's Tortious Interference Claim Should Be Dismissed With Prejudice

In responding to Billings Clinic's summary judgment motion, Kelley concedes that he "does not believe that he has sufficient facts to create a triable issue regarding his claim for tortious interference, and does not oppose dismissal **without prejudice** of that cause of action." *ECF 68 at 21* (emphasis added). In reply, Billings Clinic notes that the claim "should be dismissed **with** prejudice. *ECF 70 at 17, n.2* (emphasis added).

Here, the Court believes dismissal of Kelley's tortious interference claim with prejudice is appropriate. Kelley concedes that sufficient facts to advance a triable claim are absent. Discovery in this matter closed on May 15, 2013. *ECF 23*. Kelley has had ample time to discover factual support, if any exists, for the tortious interference claim. He concedes that he has not unearthed such factual support. Thus, it appears clear at this juncture that the claim could not be saved or resurrected by amendment of the complaint. Accordingly, the Court will recommend dismissal of the claim with prejudice.

## III. Conclusion

Based on the foregoing, IT IS ORDERED that Kelley's motion (*ECF 71*) for leave to supplement his response to Billings Clinic's summary judgment motion by filing a SDF is GRANTED.  The Clerk of Court shall promptly file Kelley's Statement of Disputed Facts found at ECF 71-1.  And,

IT IS RECOMMENDED that Billings Clinic's summary judgment motion (*ECF 63*) be GRANTED, in part, and DENIED, in part, as set forth herein.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Order and Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations portion must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.

DATED this 21st day of January, 2013.

/s/ Carolyn S. Ostby
United States Magistrate Judge